NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued December 3, 2013
Decided December 19, 2013

**Before**

RICHARD A. POSNER, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

| | |
|---|---|
| No. 13-2015 | Appeal from the United States District Court for the Central District of Illinois |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, | No. 09-CR-10047 |
| *v.* | **Michael M. Mihm**, *Judge*. |
| EARL E. ROSS, JR., *Defendant-Appellant*. | |

## O R D E R

After police officers found a handgun in Earl Ross's home, he was indicted for possessing a firearm as a felon. Ross moved to suppress the handgun and twice moved to dismiss the indictment. The district court denied Ross's motions, and he entered a conditional plea of guilty. The district court sentenced Ross to 15 years'

imprisonment—the statutory minimum under the Armed Career Criminal Act. Ross appeals the denial of his motion to suppress the handgun, the denials of his motions to dismiss the indictment, and the application of the Armed Career Criminal Act. We affirm.

## I. Background

In the early 1980s, Earl E. Ross, Jr., racked up five separate felony convictions—attempted robbery, burglary (twice), theft, and deceptive practices. Ross served sentences in the Illinois Department of Corrections, was released, and then was convicted of aggravated battery—another felony—in 1985. Ross was sent back to prison, but was subsequently paroled and was eventually discharged on November 28, 1988. In 1992, Ross was convicted of two more felonies —aggravated batteries—and yet again was sent to prison. Ross made parole and then was discharged in September 1997.

On March 10, 2009, Ross was visiting his child at the home of the child's mother, Janice Cockroft, and her boyfriend, Robert Cotelleso. A disagreement between Ross and Cockroft escalated when Ross threatened Cockroft, left, and then returned with a handgun. While outside Cockroft's home, Ross fired the handgun several times in the air and then drove away. Shortly after the Peoria Police Department received a report about the incident, Officer Nicholas Manson arrived on the scene and interviewed Cockroft, Cotelleso, and two neighbors. He reported by radio that Ross, the shooter, was a black man wearing a black leather jacket and glasses who had left the scene in a dark blue or black sedan and lived on nearby Millmann Street a couple of houses in from MacArthur Avenue. Officer Manson also inspected the scene and discovered seven shell casings.

Meanwhile, Sergeant Cover as well as Officer Dave Buchanan and his partner converged on Millmann street. Cover spoke with the residents of 910 Millmann and learned that Ross lived at 908 Millmann.  Officer Buchanan observed a dark blue sedan parked in the driveway at 908 Millmann. Officer Buchanan and his partner then began repeatedly knocking on the front door of 908 Millmann while Sergeant Cover and at least two other officers surrounded the house. Eventually, a black male wearing a black leather jacket and glasses answered the door. Officer Buchanan and his partner told the man they needed to talk to Ross. The man responded, "He ain't here. He just left." One of the officers asked if Ross lived there, and the man responded "Don't worry about it. It's none of your business." When Officer Buchanan asked for identification, the man

responded, "It's none of your business. Don't worry about it. You need a warrant." Officer Buchanan explained that they were investigating a call involving a firearm and needed to identify the man at the door. The man repeated, "Don't worry about it. This is none of your business," and began closing the door. Officer Buchanan stepped into the threshold to prevent the door from closing, and told the man he needed to identify himself or else he'd be arrested for obstructing the police. The man continued to refuse to identify himself and so the officers stepped a few feet into the house, handcuffed the man, and placed him under arrest. They then escorted the man outside of the house. The officers patted down the man and found no gun, but did find a wallet containing a card identifying the man as Ross.

Sergeant Cover determined that the sedan belonged to a woman in Peoria, telephoned her, and obtained consent to search the sedan. However, no gun was found in the car. The police also swept the house—searching rooms and places where persons might be hiding—but found no one and saw no gun. The police then sought and obtained a search warrant to search the house for the handgun. While executing the search warrant, the police found a handgun in a kitchen cabinet. A crime lab subsequently determined that the discovered handgun fired the shell casings found by Officer Mason.

Ross was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).[1] Ross moved to suppress the handgun on the theory that the warrantless entry into his house to place him under arrest violated his rights under the Fourth Amendment, and that the seizure of the handgun was a result of the constitutional violation. The district court concluded that exigent circumstances justified the entry into the house because there was a risk that Ross would fire the gun again.

Ross also moved to dismiss the indictment on the grounds that his civil rights had been restored when he was discharged from parole in 1997. Ross was unable to provide a copy of his 1997 discharge letter, but Edward Huntley, Special Litigation Counsel for the Illinois Department of Corrections, testified about the Department's practices concerning restoration-of-rights notices and provided a sample of the discharge letter that the Department used in 1997. That sample letter read, in pertinent part,

---

[1] Ross was also charged with unlawful possession of a stolen firearm, but the district court dismissed that count.

> We are pleased to inform you of the restoration of your right to vote and to hold offices created under the Constitution of the State of Illinois. You also have the right to restoration of licenses granted to you under the authority of the state of Illinois if such license was revoked solely as a result of your conviction, unless the licensing authority determines that such restoration would not be in the public interest.

The parties stipulated that Ross believed the letter he actually received in 1997—in relation to his sentence for his 1992 convictions—was like the sample letter. Regarding his convictions in the early 1980s, neither Ross nor the Illinois Department of Corrections had copies of the discharge letter. However, Huntley testified that, prior to July 1991, the Department did not use any restoration-of-rights language when informing convicts of their discharge. And the letter Ross received when he was discharged in 1988 after serving his sentence for his 1985 felony did not contain any restoration-of-rights language. The district court then concluded that the 1992 convictions could not support the felon-in-possession charge because the discharge letter Ross likely received in 1997 probably contained restoration-of-rights language without specifically excluding the right to posses a firearm. Nonetheless, the district court denied Ross's motion to dismiss because the felonies from the 1980s supported the felon-in-possession charge.

Thereupon, Ross pleaded guilty conditioned on his right to appeal the district court's denials of his motion to suppress and motion to dismiss.[2] During the plea colloquy, Ross's attorney orally moved to dismiss the indictment and argued that, in order to establish Ross's guilt, the government had to prove that Ross traveled with the handgun in interstate commerce or, at least, knew that it had traveled in interstate commerce. The district court denied the motion to dismiss, but the government agreed to allow Ross to raise his new argument on appeal.

At sentencing, Ross's pre-sentencing report (PSR) found that Ross qualified for an enhanced sentence—a statutory mandatory minimum sentence of 15 years

---

[2] Ross actually pleaded guilty twice. Initially he pleaded guilty unconditionally, but then moved to withdraw his guilty plea. The district court denied the motion, but on appeal the parties jointly moved for a remand order allowing Ross to withdraw his guilty plea and we granted that motion. *See United States v. Ross*, 11-3742 (7th Cir. June 29, 2012).

—pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), because he had at least three prior violent felonies. In support, the PSR cited Ross's attempted robbery conviction, burglary convictions, and aggravated battery conviction—all from the 1980s. Because the discharge letter he likely received in 1997 probably contained restoration-of-rights language, Ross objected to the use of any of his prior convictions to support application of the ACCA. The district court agreed that the 1992 convictions definitely "would not be used for purposes of determining whether" the ACCA applied, but the court concluded that the convictions from the 1980s did apply. Therefore, the district court sentence Ross to 15 years' imprisonment. Ross appeals his conviction and sentence.

## II. Analysis

On appeal, Ross contends that his conviction should be vacated for a number of reasons. First, because the handgun discovered in Ross's home was fruit of the poisonous tree. Second, because he received a discharge letter in 1997 that contained restoration-of-rights language that could have misled him into believing that his right to possess a firearm was restored regardless of when his prior felony offenses occurred. Third, because the government conceded that it could not prove that Ross knew that the handgun had traveled in interstate commerce. Finally, Ross argues that his sentence should be vacated because the district court erred by sentencing him under the ACCA because his 1997 discharge letter contained restoration-of-rights language that rendered all of his prior convictions irrelevant for ACCA purposes.

### A.      Ross's Motion to Suppress the Handgun

Ross first argues that the district court should have granted his motion to suppress the handgun discovered in his home because it was the fruit of Officer Buchanan and his partner's warrantless entry into his home. The district court concluded that exigent circumstances justified the officers' warrantless entry into Ross's home. "Warrantless searches of areas entitled to Fourth Amendment protection are presumptively unreasonable, but the government may overcome this presumption by demonstrating that, from the perspective of the officer at the scene, a reasonable officer could believe that exigent circumstances existed and that there was no time to obtain a warrant." *United States v. Schmidt*, 700 F.3d 934, 937 (7th Cir. 2012). "In reviewing the district court's denial of a motion to suppress, we review factual findings for clear error

and issues of law de novo, and whether exigent circumstances existed is a mixed question of fact and law that is reviewed de novo." *Id.*

Exigent circumstances exist, for example, when officers are in hot pursuit of a fleeing suspect, there is a need to render emergency assistance to an injured occupant or to protect an occupant from imminent injury, or there is a need to prevent the imminent destruction of evidence. *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011). In this case, the district court was concerned that Ross would retrieve and use the handgun again after shutting the door on Officer Buchanan and his partner. We have found exigent circumstances justifying warrantless entries where officers fear that a gun may be fired at them or others from within the dwelling. *See United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005) (finding exigent circumstances for warrantless entry into home where officers believed the defendant could access potentially loaded gun inside); *United States v. Taylor*, 179 F. App'x 957, 959 (7th Cir. 2006) (finding exigent circumstances for warrantless entry into home "to ensure that no one posed a threat to them or anyone else" where, although suspect was observed leaving the house, officers knew that a gun was likely within the home); *United States v. Craig*, 12 F.3d 1101, at *6 (7th Cir. 1993) (unpublished Table decision) (finding exigent circumstances for officers' warrantless entry into garage because the defendant "might have been able to shoot at them from inside the garage or the house."); *see also United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010) ("[W]here police reasonably believe that their safety, or the safety of the public, may be threatened, exigent circumstances exist.").[3]

But we need not decide whether exigent circumstances existed here. As Ross's counsel correctly conceded at oral argument, the officers' warrantless entry did not causally contribute to the subsequently obtained search warrant. The police did not see the handgun when they entered Ross's home prior to obtaining the search warrant and they did not find the handgun on Ross when they arrested him. Rather, the police legally obtained the evidence that established probable cause to believe the handgun was in the house. Therefore, the warrantless entry did not taint the search warrant that led to the discovery of the handgun, and so the handgun was not the fruit of the

---

[3] On the other hand, at the time of the warrantless entry, the officers apparently did not know Ross was a felon. We are troubled by the idea that exigent circumstances exist simply because law enforcement officers have probable cause to believe a person has a firearm in his home—a right guaranteed by the Constitution—though, that Ross had recently fired the handgun at the home of his former lover may alter the equation.

warrantless entry. *See United States v. Etchin*, 614 F.3d 726, 736-38 (7th Cir. 2010) (a detective's entrance into a defendant's apartment while another detective worked on a warrant application did not require exclusion of evidence obtained while executing the warrant because *Segura's* "wholly unconnected" rule applied) (citing *Segura v. United States*, 468 U.S. 796, 813–16 (1984)). Consequently, Ross was not entitled to have the handgun suppressed.

### B.      Ross's Motions to Dismiss the Indictment

Next, Ross contends that the district court should have granted his motions to dismiss the indictment because his 1997 discharge letter probably contained restoration-of-rights language that could have misled him into believing that his right to possess a firearm was restored regardless of his prior felony offenses and because the government could not  prove that Ross knew that the handgun had traveled in interstate commerce. "We review questions of law in a district court's ruling on a motion to dismiss an indictment de novo." *United States v. Sarraj*, 665 F.3d 916, 920 (7th Cir. 2012) (quoting *United States v. White*, 610 F.3d 956, 958 (7th Cir. 2010)). But we review the district court's factual determinations for clear error. *United States v. Loera*, 565 F.3d 406, 411 (7th Cir. 2009).

Ross first argues that none of his felony convictions predating the 1997 discharge letter could be used as predicate offenses for the felon-in-possession charge. "Any conviction … for which a person … has had civil rights restored shall not be considered a conviction for purposes of [a felon-in-possession charge], unless such … restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms." 18 U.S.C. § 921(a)(20). Under our precedent, this "anti-mousetrapping provision" applies if the "the state sent [the defendant] a document stating that his principal civil rights have been restored, while neglecting to mention the continuing firearms disability …." *Buchmeier v. United States*, 581 F.3d 561, 566–67 (7th Cir. 2009) (en banc). But "inclusion of a date that ties the letter [sent by the state to the defendant] to a single sentence implies that rights have been restored with respect to the convictions underlying that sentence only." *United States v. Burnett*, 641 F.3d 894, 896 (7th Cir. 2011).

Here, the evidence establishes that the discharge letter Ross likely received in 1997 probably contained restoration-of-rights language but did not mention Ross's continuing firearms disability. But the government offered unrebutted evidence that such a letter would also have contained a reference to the specific date of completion of

his sentence that he was serving for his 1992 convictions. Accordingly, the 1997 letter would only imply rights restored related to the 1992 convictions. And the discharge letter Ross received in 1988, which related to his sentence for his 1985 conviction, did not contain restoration-of-rights language. The evidence also established that any discharge communication Ross received with respect to his sentences for his convictions in the early 1980s would not have contained restoration-of-rights language. Consequently, pursuant to *Buchmeier* and *Burnett*, the district court correctly concluded that Ross's 1992 convictions could not be used as predicate offenses for the felon-in-possession charge, but that his 1980s convictions could be.

Ross argues that the rule from *Burnett*—that discharge letters are conviction-specific—should not apply to him because the letter that he likely received in 1997 is no longer available. Perhaps Ross is concerned that his 1997 discharge letter may not have actually referenced the specific date of completion of his sentence for his 1992 convictions. But Ross stipulated that he believed that his 1997 discharge letter was like the sample one, and the sample letter included a reference to the sentence-completion date. The burden of proving that his rights have been restored is upon Ross. *United States v. Foster*, 652 F.3d 776, 791 (7th Cir. 2011). Given, the government's contrary (and unrebutted) evidence, and Ross' stipulation, Ross did not meet this burden.[4]

Alternatively, Ross argues that the government cannot prove that he knew that the handgun had traveled in interstate commerce. But we have repeatedly rejected the argument that, in a prosecution under § 922(g), the government must prove that the defendant knew that the firearm had traveled in interstate commerce. *See, e.g., Sarraj*, 665 F.3d at 921 ("The interstate nexus requirement is a factual predicate, not a mens rea element of the crime that would require proof of defendant's knowledge of facts supporting the nexus."); *United States v. Lindemann*, 85 F.3d 1232, 1241 (7th Cir. 1996) ("Thus it has consistently been held that for statutes in which Congress included an 'interstate nexus' for the purpose of establishing a basis for its authority, the government … need not prove that the defendant knew the 'interstate nexus' of his actions."); *United States v. Castor*, 937 F.2d 293, 298 (7th Cir. 1991) (same). Ross urges us to overturn this precedent, and cites a Supreme Court decision construing a penalty-

---

[4] Furthermore, Ross's argument that *Burnett* ought not apply to cases in which the discharge letter is unavailable would create perverse incentives because it would put an offender who does not retain his discharge letter in a better position than one who does.

enhancing provision that applies when an "offender 'knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person.'" *Flores-Figueroa v. United States*, 556 U.S. 646, 647 (2009) (quoting 18 U.S.C. § 1028A(a)(1) (emphasis removed)). The Supreme Court concluded that "the statute requires the Government to show that the defendant *knew* that the 'means of identification' he or she unlawfully transferred, possessed, or used, in fact, belonged to 'another person.'" *Id.* But the statute that the Supreme Court construed in *Flores-Figueroa* was worded very differently than § 922(g)(1). Moreover, *Flores-Figueroa* came down well before our decision in *Sarraj*. Therefore, *Flores-Figueroa* does not compel us to revisit *Sarraj* and its progenitors. *Santos v. United States*, 461 F.3d 886, 891 (7th Cir. 2006) ("We require a compelling reason to overturn circuit precedent." (quotation marks omitted)). To the extent Ross seeks to preserve this argument for possible review by the Supreme Court, he has done so. Ross was not entitled to have the indictment dismissed.

### C.      Application of the ACCA

Finally, Ross argues that his sentence should be vacated because the district court erred when it sentenced him pursuant to the ACCA. "The ACCA provides that anyone who has 'three previous convictions … for a violent felony or a serious drug offense, or both, committed on occasions different from one another' is an armed career criminal and subject to a fifteen-year mandatory minimum sentence." *Kirkland v. United States*, 687 F.3d 878, 883 (7th Cir. 2012) (quoting 18 U.S.C. § 924(e)(1)). We review de novo the district court's application of the ACCA to Ross's sentence. *Id.* at 882. "Any factual findings related to [the defendant's] prior convictions, however, are reviewed for clear error." *Id.* at 883.

Ross contends that because his 1992 convictions could not serve as predicate offenses for his felon-in-possession charge, neither can the district court use them at sentencing to invoke the ACCA. Certainly, a conviction for which a person has had his civil rights restored does not count as a violent felony under the ACCA unless the restoration of civil rights expressly provides that the person may not ship, transport, possess, or receive firearms. *Foster*, 652 F.3d at 793. But the district court did not rely upon Ross's 1992 convictions in applying the ACCA. Rather, the PSR and the district court excluded these convictions and relied solely upon four of Ross's convictions from the 1980s. Ross also argues that none of his convictions could be used to invoke the ACCA. But this argument mirrors his argument in support of his motion to dismiss the indictment, and consequently fails for the same reasons.

### III. Conclusion

Ross was not entitled to suppression of the handgun or dismissal of his indictment. Nor did the district court err in sentencing Ross pursuant to the ACCA. Therefore, we **AFFIRM** Ross's conviction and sentence.